**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**
**CENTRAL DIVISION**

|  |  |  |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | Case No. 10-43245-MSH |
| STRATEGIC LABOR, INC. | ) | |
| | ) | |
| Debtor | ) | |
| | ) | |

**MEMORANDUM OF DECISION ON MOTION OF THE UNITED STATES FOR**
**ADEQUATE PROTECTION, ACCOUNTING, DISGORGEMENT, AND PAYMENT;**
**AND MOTION AND AMENDED MOTION OF THE DEBTOR FOR RECOVERY**
**PURSUANT TO 11 U.S.C. § 506(c)**

This matter offers an object lesson in how not to run a chapter 11 case. The dispute between the Internal Revenue Service and the debtor, Strategic Labor, Inc., is embodied in the following motions now under consideration: Creditor United States' Motion For Adequate Protection, Accounting, Disgorgement, And Payment Of The United States' Prepetition Tax Claim [Docket #87]; Motion Of Debtor In Possession For Recovery Pursuant To 11 U.S.C. § 506(c) Of The Reasonable And Necessary Costs And Expenses Of Preserving And Disposing Of Property Securing The Secured Claim Of The Internal Revenue Service For Its Benefit [#99]; and Amended Motion Of Debtor In Possession For Recovery Pursuant To 11 U.S.C. § 506(c) Of The Reasonable And Necessary Costs And Expenses Of Preserving And Disposing Of Property Securing The Secured Claim Of The Internal Revenue Service For Its Benefit [#116]. None of the motions would have been necessary had Strategic Labor and its counsel administered this case with more care and candor or if the IRS had stepped in earlier to assert its rights. The IRS has offered a plausible

1

although, with the benefit of hindsight, not necessarily a superlative explanation for its apathy.

The conduct of the debtor and its counsel, on the other hand, defies justification.[1]

## Background

The relevant facts are not in dispute. On June 28, 2010 Strategic Labor, a company which

developed, distributed and supported automated workforce scheduling software, filed a voluntary

petition for reorganization under chapter 11 of the Bankruptcy Code[2] for the stated purpose of

consummating a sale of its assets. Strategic Labor's counsel on the petition date and throughout

this case was The Gordon Law Firm LLP. A few days after the bankruptcy filing, on July 2, 2010,

Infor Global Solutions (Michigan), Inc., a reseller of Strategic Labor's software, entered into an

asset purchase agreement (the "APA") with Strategic Labor pursuant to which Infor agreed to

acquire substantially all the company's assets, excluding cash, accounts receivable and

"work-in-progress accounts receivable,"[3] for a purchase price of $200,000. On the same day

Strategic Labor filed its motion to sell the assets to Infor or the highest bidder free and clear of

liens pursuant to Bankruptcy Code § 363.

---

[1]  Lest the United States trustee feel neglected, it must be observed that more careful monitoring of the administration of this case by United States trustee personnel might also have prevented or at least blunted the impact of the present situation.

[2]  *See* 11 U.S.C. § 101 *et seq*. (the "Bankruptcy Code" or the "Code"). All references to statutory sections are to the Bankruptcy Code unless otherwise specified.

[3]  The APA defines "work-in-progress accounts receivable" as receivables for services or product delivered but not yet invoiced. It is likely that work-in-progress accounts receivable are the same as "anticipated future billings in open software contracts" identified as one of Strategic Labor's assets in the Gondek Affidavit discussed later in this memorandum.

According to the schedules of assets and liabilities filed by Strategic Labor to support its

bankruptcy petition, the company had assets valued at $112,137.53 on the petition date consisting

primarily of accounts receivable valued at $103,141.29. Schedule D entitled "Creditors Holding

Secured Claims" listed a single creditor, Balboa Capital, holding a secured claim in the amount of

$18,000. The schedule described Balboa Capital's collateral as "workforce scheduling product

development software" of "undetermined value."[4]  Strategic Labor did not list the IRS as a secured

creditor but rather scheduled the IRS's claim as a priority unsecured claim in the amount of

$491,594.62 on schedule E along with the wage claims of certain employees, including members

of the Gondek family. The family wage claimants were Michael Gondek, the debtor's president

and 20% shareholder; James Gondek, the debtor's secretary and 50.5% shareholder; Richard

Gondek, the debtor's director of professional services and 27% shareholder; and Daniel Gondek,

whose primary duties have been described as handling customer support. James is the father of

Michael, Richard and Daniel. All are insiders as defined in Bankruptcy Code § 101(31)(B).

Despite listing the IRS in its schedules as an unsecured priority creditor, in its statement of

financial affairs (the "SOFA") accompanying the schedules Strategic Labor represented that the

---

[4]  In its statement of material facts, the IRS asserted that Balboa Capital "did not file a proof of
claim in this bankruptcy case, and it is not a holder of a secured claim." It cites the claims
register as authority for that statement. But a secured creditor's failure to file a proof of claim
does not render its claim unsecured. *In re MacKenzie*, 314 B.R. 277, 279 (Bankr. D.N.H. 2004)
("If a secured creditor does not file a proof of claim, it may look to its lien for satisfaction of the
debt because the failure to file does not affect the validity of a perfected lien.").

3

IRS had placed a tax lien on its assets in the amount of $492,569.28, an amount slightly higher than the amount stated in schedule E.

It is also to be noted that while schedule H of Strategic Labor's schedules of assets and liabilities did not list any co-debtors for any of the company's obligations, the IRS has alleged and the debtor has not denied that James, Michael and Richard Gondek were individual guarantors of the Balboa Capital debt.

Not only are the schedules incomplete and inconsistent with the SOFA they are also inconsistent with statements in the affidavit of Michael Gondek filed in support of first day motions on June 30, 2010 (the "Gondek Affidavit"). According to the affidavit, the debtor had, as of the petition date, "(i) cash on hand of $4,650; (ii) accounts receivable of $103,141.21; and (iii) anticipated future billings in open software contracts of $184,095.00" for a total asset valuation of $291,886.21. Mr. Gondek also stated that:

> 14. Prior to the Petition Date, the Debtor granted a security interest in substantially all of its assets to Balboa Capital ("Balboa") to secure financing in the amount of approximately $128,000 provided by Balboa for the debtor's product development initiatives in 2008. To perfect its security interest in the Debtor's assets, Balboa filed a UCC-1 Financing Statement under the name Carbaldav on January 30, 2008. As of May 31, 2010, the approximate amount owed to Balboa by the Debtor was $18,633.86.

> [and]

> 16. As of the Petition Date, the Internal Revenue Service held tax liens of $469,004.94 against the Debtor's assets resulting from the Debtor's alleged failure to make payroll tax payments in parts of 2007 and 2008. Of the total liens as of May

4

31, 2010, $290,859.17 is attributed to tax, $145,703.16 is attributed to penalties, and $32,482.61 is attributed to interest.

Mr. Gondek's affidavit, filed two days after the bankruptcy petition and prior to the schedules and SOFA, materially contradicts the schedules as to the extent of Balboa's security interest in Strategic Labor's assets, the value and description of those assets and the status of the IRS as a secured creditor.[5]

On June 30, 2010 Strategic Labor filed an "Emergency Motion for Entry of Interim and Final Orders (1) Approving Post-Petition Financing Pursuant to 11 U.S.C. §§ 105, 362, 363, 364 and 507, (2) Granting Liens and Providing for Superpriority Administrative Expense Status, (3) Modifying the Automatic Stay, and (4) Scheduling a Final Hearing" (the "DIP motion") seeking to borrow up to $50,000 from Infor, the stalking horse bidder under its sale motion. In the DIP motion Strategic Labor acknowledged the IRS's lien stating:

> Approximately six (6) months ago, the Debtor and the Lender [Infor] began discussing the purchase by the Lender of certain of the Debtor's assets. Shortly thereafter, and during the Lender's due diligence, the Debtor learned for the first time that it had substantial payroll tax liens of $470,000.

On July 7, 2010, I entered an interim order and on July 22, 2010 a final order allowing the DIP motion which authorized Strategic Labor to borrow up to $50,000 from Infor (the "DIP loan")

---

[5] According to a transcript submitted by the IRS, both James and Michael Gondek attended the debtor's meeting of creditors under Bankruptcy Code § 341 on August 4, 2010. When asked if Balboa Capital's collateral consisted of the workforce scheduling product, James responded affirmatively. Michael did not respond.

and granted Infor a security interest in all of the debtor's property *subject to* "existing, valid, prior, and otherwise unavoidable, perfected liens and security interests. . . ." Neither the DIP Motion nor the order referred to Balboa Capital or the IRS by name but the order clearly subordinated Infor's security interest to their liens to the extent valid. The DIP Motion did not include nor was it accompanied by a request to use cash collateral of any secured creditor; in fact, Strategic Labor acknowledges that it never made such a request at any point in this case. Indeed, the DIP motion proclaimed that Strategic Labor had no intention of using either the IRS's or Balboa's cash collateral. Paragraph 16 of the DIP motion states:

> Approval of the DIP Facility will provide the Debtor with immediate and ongoing access to borrowing availability to pay its operating expenses, including post-petition wages, as well as to satisfy the costs of administration of this case.

The IRS was served with a copy of the DIP motion and did not object to it.

On August 18, 2010, the IRS filed a proof of claim in the amount of $491,505.37 arising from Strategic Labor's failure to remit payroll taxes to the IRS. The IRS asserted a security interest in all of Strategic Labor's personal property. Attached to its proof of claim was a schedule setting forth a series of federal tax liens for tax periods in 2007 and 2008, notices of which had been filed between December 24, 2009 and January 28, 2010 in the United States District Court for the District of Massachusetts in accordance with 26 U.S.C. § 6323(f)(1)(A)(ii).[6]

---

[6] Section 6321 of the Internal Revenue Code, 26 U.S.C. § 6321 (the "IRC") gives the United States a lien on all personal and real property of any taxpayer who is liable for taxes and does not pay them after a demand is made. IRC § 6323(a) requires a notice which meets the requirements of subsection (f) before the lien imposed by § 6321 is valid. Section 6232(f) permits the notice of

According to its monthly operating reports filed with the United States trustee,[7] Strategic Labor received a total of $41,000 in DIP financing from Infor.[8] Strategic Labor repaid the DIP loan in full during the bankruptcy. Paragraph 9 of the final order approving the DIP motion provides for the loan to be repaid out of the proceeds of the sale of the debtor's assets.   The term sheet for the DIP loan provides that the loan would serve as Infor's deposit for the purchase of the assets. Neither of these provisions was complied with. Instead, the debtor's monthly operating report for the month of August 2010 indicates that during that month Strategic Labor, using cash in its general operating account, repaid Infor by check in the amount of $1,000 and by electronic transfer in the amount of $40,388.61. The monthly operating report described both payments as "Repay DIP Financing."

As indicated previously, on July 2, 2010 Strategic Labor filed its motion to sell substantially all its assets to Infor free and clear of liens, claims, and encumbrances pursuant to the APA and also to approve bidding procedures for the sale. Paragraph 4 of the order approving the

---

a lien on personal property to be filed with the office of the clerk of the United States district court for the district in which the property is located. The debtor does not dispute that the lien was properly noticed and is valid.

[7] I may take judicial notice of the monthly operating reports which are signed by the debtor under the pains and penalties of perjury and filed with the United States trustee. *In re Harmony Holdings, LLC*, 393 B.R. 409, 414 (Bankr. D.S.C. 2008).

[8] The September 2010 monthly operating report also lists a payment from Infor to the debtor in the amount of $14,737.30. Unlike the payments comprising the $41,000, this payment is not described as "DIP FINANCING". It appears to be a payment of an account receivable owed to the debtor by Infor.

bidding procedures, the proposed form of which was drafted by the Gordon firm, provided that the "Notice of Auction and Sale Hearing" was to be served on, among others, "all parties known to the Debtor to have, or assert any liens, claims and encumbrances or other interest against the Debtor, including (a) the Internal Revenue Service. . . ."   The IRS was served with the Notice of Auction and Sale Hearing and did not oppose the sale.

In response to the sale notice, Strategic Labor received an offer for its assets from a third party that was higher than Infor's stalking horse bid. According to the bid procedures previously established, this resulted in an open cry auction at the sale hearing between Infor and the third party in which Infor emerged victorious with a final bid of $300,000, a $100,000 improvement on its stalking horse bid. My order approving the sale to Infor was entered on August 30, 2010 and the sale was consummated on September 3, 2010. The sale proceeds of $300,000 were deposited into the Gordon firm's IOLTA clients' funds account.[9]

On November 15, 2010 the Gordon firm filed its first interim application for compensation seeking $78,738.05 consisting of $73,587.50 in fees and $5,150.55 in expense reimbursement. Notice of the fee application was served on the IRS. The application was allowed without objection. On May 4, 2011 the Gordon firm filed its final fee application in which it sought approval of the previously allowed interim award as well as additional fees of $35,799.50 and

_____

[9]  IOLTA, which stands for "Interest on Lawyers' Trust Accounts," "is a program mandated by the Supreme Judicial Court [of Massachusetts]. It requires lawyers and law firms to establish interest-bearing accounts for client deposits which are nominal in amount or large amounts held for a short period of time." (www.maiolta.org) (last visited February 8, 2012).

expense reimbursement of $699.30. No objections were raised to the final fee application and it too was allowed resulting in a total award to the Gordon firm on both applications of $109,387 in fees and $5,849.85 in expense reimbursements.

Also on May 4, 2011 Strategic Labor filed its motion to dismiss this case.[10]  In the dismissal motion the company, apparently experiencing a relapse of the amnesia reflected in its original schedules of assets and liabilities, stated that Balboa Capital was its only secured creditor and once again indicated that Balboa's collateral consisted solely of workforce

---

[10]  By its motion the debtor was attempting a so-called "structured dismissal." Unlike the old-fashioned one sentence dismissal orders – "this case is hereby dismissed" – structured dismissal orders often include some or all of the following additional provisions: "releases (some more limited than others), protocols for reconciling and paying claims, 'gifting' of funds to unsecured creditors and provisions providing for the bankruptcy court's continued retention of jurisdiction over certain post-dismissal matters."   Norman L. Pernick & G. David Dean. "Structured Chapter 11 Dismissals: a Viable and Growing Alternative After Asset Sales," 29 AM. BANKR. INST. J. 1, 56 (June 2010).

An article authored by attorneys with the United States trustee program has raised concerns about structured dismissals:

> First, compared to plan confirmation, structured dismissals "end run … the protection granted creditors in Chapter 11" and strongly resemble impermissible *sub rosa* plans. Second, unlike chapter 7 liquidation, structured dismissals distribute assets without enforcing priorities, addressing litigation or ensuring accountability for distributing assets. Third, unlike traditional dismissals, structured dismissals fail to reinstate state law creditor remedies.

Nan Roberts Eitel, T. Patrick Tinker & Lisa L. Lambert, "Structured Dismissals, Or Cases Dismissed Outside of Code's Structure?", 30 AM. BANKR. INST. J. 20, 20 (March 2011), (quoting *The Institutional Creditors of Continental Airlines, Inc. v. Continental Airlines, Inc. (In re Continental Air Lines, Inc.)*, 780 F.2d 1223, 1224 (5th Cir.1986)).

scheduling product development software. The debtor also revealed that it had paid Balboa in full satisfaction of its secured claim although it did not identify the source of the funds for such payment.[11]  The dismissal motion described the IRS as an unsecured priority creditor holding a claim of $491,505.37. The debtor also disclosed for the first time two additional unsecured priority creditors, the Massachusetts Division of Unemployment Assistance and the Massachusetts Department of Revenue, with claims according to the debtor of $36,123.79 and $2251.71, respectively. The debtor proposed that after payment of the Gordon firm's final fee request of $36,498.80 the balance would be distributed pro rata to the three priority unsecured creditors. The motion made no mention of the priority wage claims originally listed on schedule E to the debtor's bankruptcy petition.[12]  Finally, Strategic Labor's motion to dismiss revealed for the first time on the record of this case, in addition to the payment to Balboa, that the Gordon firm was holding in its IOLTA account not the full $300,000 proceeds of the sale to Infor but $221,261.95. Evidently the Gordon firm had released and Strategic Labor had paid from the $300,000 sale proceeds $78,738.05 in interim fees and expenses of the Gordon firm.

Strategic Labor's motion to dismiss caught the attention of the IRS. The slumbering giant was aroused and began to stir. It filed an objection to the motion to dismiss. At the hearing on the motion it became clear that on Strategic Labor's bankruptcy petition date the IRS held a security

---

[11]  The debtor's United States trustee monthly operating reports indicate that it paid Balboa $18,957.41 in approximately equal installments between July 30, 2010 and February 3, 2011.

[12]  The debtor never sought to amend its schedules to reflect the information contained in its motion to dismiss.

interest in all the debtor's assets by virtue of its pre-petition tax liens, that its liens had attached

to the proceeds of the sale to Infor, that Strategic Labor had never sought authority to use the

IRS's cash collateral, including the sale proceeds, and hence that the validity of some or all

post-petition payments made by Strategic Labor using the IRS's cash collateral could be called

into question.[13]  Based on the information in the motion to dismiss that the assets of the estate

consisted only of the $221,261.95 remaining sale proceeds, the IRS rightly concluded that during

the course of this chapter 11 case Strategic Labor had burned through a great deal of the IRS's

cash collateral. In light of these startling revelations the motion to dismiss was denied.

### The Dispute

Matters, of course, did not end there. The IRS filed the presently pending motion for an

accounting, adequate protection, disgorgement and payment.[14]  Distilled to its essence, the IRS

seeks immediate payment of all funds remaining in the Gordon firm's IOLTA account,

disgorgement from the Gordon firm of its $78,738.05 interim fee award and disgorgement from

the Gondeks of $59,061.95 in compensation and benefits paid to them by Strategic Labor during

the chapter 11 case[15] plus $18,000 on the basis that three of the Gondeks were guarantors of the

---

[13]  Although the IRS has not raised it, this would appear to include the $40,388.61 repayment of
the DIP loan. A future chapter 7 trustee will no doubt investigate this and other payments.

[14]  The IRS's request for an accounting appears to have been satisfied voluntarily by the debtor.

[15]  The IRS's figure is slightly higher than the one used by the debtor in its amended § 506(c)
motion.    Neither the IRS's nor the debtor's figure foots to the debtor's payroll records from
June 28, 2010 to December 31, 2010 which the IRS submitted. These records reveal that Michael
Gondek received three payroll checks: one labeled "regular" in the net amount of $1,378.25 and
two labeled "bonus" in the net amounts of $2,844.91 and $1,466.69.    From June 28, 2010

11

Balboa loan and thus benefitted personally when they caused Strategic Labor to make its

post-petition payments to Balboa.

Strategic Labor's primary response to the IRS's attack was to file its presently pending

motions seeking to surcharge the IRS's cash collateral under Bankruptcy Code § 506(c)[16] for the

Gordon firm's fees and expenses totaling $100,661.35, consisting of the $78,738.05 previously

paid and an additional $21,923.30 of the $36,498.80 requested in the firm's final fee application.

The debtor also sought to recover $55,738.51 in compensation and benefits paid to the Gondeks.

Strategic Labor justified its surcharge request by pointing out that the chapter 11 case was filed for

---

through August 29, 2010 Daniel received a net total of $5,521.29 (although the debtor listed the
figure as $5,520.97 in its amended § 506(c) motion) while Richard received a total net salary of
$10,740.12 for the same period. The payroll records indicate that James received a total net
salary, including one check listed as a "bonus," of $31,549.57 for the period from June 28, 2010
through December 31, 2010 although the amended § 506(c) motion listed his net pay for the
same period as $29,122.68. Based on the payroll records during the post-petition period through
the end of 2010, the Gondeks collectively netted salaries totaling $53,500.83. The debtor
acknowledges the following additional amounts as reimbursement of expenses: $1,410.84
(Michael); $372.88 (James); and $2,881.17 (Richard). Salary and expense reimbursements to the
Gondeks thus total $58,165.72 and I will use this figure.

Similarly the $18,000 figure used by the IRS is slightly lower than the actual amount paid
to Balboa of $18,957.41 as reflected in the debtor's monthly operating reports. I will use the
amount reflected in the monthly operating reports.

[16] Section 506(c) provides:

> The trustee may recover from property securing an allowed secured claim the
> reasonable, necessary costs and expenses of preserving, or disposing of, such
> property to the extent of any benefit to the holder of such claim, including the
> payment of all ad valorem property taxes with respect to the property.

the sole purpose of consummating a sale of its assets on a going concern basis under Bankruptcy

Code § 363, that the IRS received notice of the sale in addition to all other pleadings filed in the

case and by not objecting to the sale the IRS is deemed to have consented to it, and that the § 363

sale process generated a bidding war that resulted in a final sale price of $300,000, a 50% premium

over the initial price and far more than the IRS would have realized had it shut Strategic Labor

down and liquidated its assets at a tax sale. In short, Strategic Labor claims that since the chapter

11 process resulted in a substantial benefit to the IRS the costs of achieving that benefit should be

chargeable to the IRS's recovery. The IRS opposes in its entirety Strategic Labor's request for a

§ 506(c) recovery.

     While the surcharge motions are clearly Strategic Labor's preferred solution to the IRS's

disgorgement motion, Strategic Labor has offered two additional grounds for avoiding the impact

of the IRS's motion. First, Strategic Labor argues that the cash generated by the company

post-petition was not the IRS's cash collateral. Without citing any legal authority, Strategic Labor

asserts that the proceeds of its pre-petition receivables and open software contracts were not the

IRS's cash collateral because they would have been substantially valueless had the company not

supplied post-petition software support to the account debtors and customers. Second, Strategic

Labor suggests that even if the proceeds of the accounts receivable and software contracts were the

IRS's cash collateral, the IRS knew the debtor was spending that cash collateral and by not

objecting the IRS cannot now seek disgorgement. For this proposition Strategic Labor relies on

two bankruptcy court decisions, *Matter of Nat'l Safe Ne., Inc.*, 76 B.R.. 896 (Bankr. D. Conn.

1987) and *In re Gemel Int'l, Inc.*, 190 B.R. 4 (Bankr. D. Mass. 1995).

13

The error in the debtor's first argument is demonstrated by reading the definition of cash collateral contained in Bankruptcy Code § 363(a):

> In this section, "cash collateral" means cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents *whenever acquired* in which the estate and an entity other than the estate have an interest and includes the proceeds, products, offspring, rents, or profits of property and the fees, charges, accounts or other payments for the use or occupancy of rooms and other public facilities in hotels, motels, or other lodging properties subject to a security interest as provided in section 552(b) of this title, *whether existing before or after the commencement of a case under this title.* (emphasis supplied).

The fact that by staying in business Strategic Labor preserved the value of the IRS's collateral thereby increasing the dollar amount of the proceeds recovered therefrom doesn't change the character of the recovery from proceeds to something else. Congress recognized the value of preservation and enhancement of collateral by enacting § 506(c), not by depriving a secured creditor of its security interest in post-petition proceeds of pre-petition collateral.

As for Strategic Labor's second argument that the IRS should have objected sooner to the unauthorized use of cash collateral, the IRS credibly maintains that it was unaware of the debtor's unauthorized use until receiving the motion to dismiss by which time the money had been spent. Paragraph 16 of the DIP Motion bears repeating at this point:

> Approval of the DIP Facility will provide the Debtor with immediate and ongoing access to borrowing availability to pay its operating expenses, including post-petition wages, as well as to satisfy the costs of administration of this case.

There is no reasonable way to understand this except as a representation by Strategic Labor that it did not intend to use cash collateral to satisfy the costs of administering its chapter 11 case. Strategic Labor's commitment not to use cash collateral so fundamentally distinguishes this case

14

from *Nat'l Safe* and *Gemel* as to make any further attempt at analogy meaningless.

Strategic Labor submitted a number of affidavits to support its surcharge requests. In his affidavit, Douglas Wolfson, associate general counsel of Infor, referring to Strategic Labor as "SLI," stated:

> 4. In or about the spring of 2010, Infor completed its due diligence concerning SLI's assets and liabilities. Based on the results of Infor's due diligence review, including discovery of SLI's substantial tax liabilities, having considered and rejected a number of alternative transaction structures for acquiring the desired assets, Infor was not willing to purchase the assets of SLI without the protections afforded to asset purchasers by a Bankruptcy Code Section 363 sale conducted in accordance with the Bankruptcy Code and Rules.
>
> 5. It was crucial for Infor that its purchase of SLI's assets occur quickly as SLI's assets, nearly all intangible, were at serious risk of losing their value due to SLI's continuing financial difficulties. Infor believed that a Chapter 11 case would facilitate a prompt sale of SLI's assets and that SLI's assets would likely become worthless if it ceased doing business in the ordinary course.

In addition each of the Gondeks submitted an affidavit attesting to his efforts to keep the business operating in chapter 11, shepherding the company through the sale process and attempting to interest additional bidders to participate in the sale. A member of the Gordon firm submitted an affidavit in which he described his communications during the chapter 11 case with an IRS employee who seemed "pleased with the sale process" and who never "once raised any cash collateral or adequate protection concerns or the possibility of seeking relief in accordance with Section 363(e) or (f) of the Bankruptcy Code." In this affidavit counsel represented that it was due to the efforts of Strategic Labor's employees, "with assistance of counsel," that the second bidder was identified.

15

## Discussion and Analysis of § 506(c) Requests

Any consideration of a request to recover funds from a secured creditor's collateral requires, first of all, reference to the statute. Bankruptcy Code § 506(c) creates an exception to the general principle of bankruptcy distribution that prefers secured creditors to all other claimants with respect to the proceeds of the secured creditor's collateral by permitting a trustee or debtor in possession to recover from such proceeds the reasonable, necessary costs and expenses related to preservation or disposition of the secured creditor's collateral to the extent of any benefit to the creditor. *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 5, 120 S.Ct. 1942, 1946 (2000) ("*Henhouse*"); *In re Parque Forestal, Inc.*, 949 F.2d 504, 511 (1st Cir. 1991) (citing *In re Trim–X, Inc.,* 695 F.2d 296, 302 (7th Cir.1982)).[17]   A trustee or debtor invoking § 506(c) must establish by a preponderance of the evidence that (1) the expenditure in question was necessary, (2) the amount expended was reasonable, and (3) the secured creditor benefitted. *Parque Forestal,* 949 F.2d at 512 (citing *In re P.C., Ltd.,* 929 F.2d 203, 205 (5th Cir.1991)). The party seeking a § 506(c) recovery must prove that the benefit to the secured creditor that was "concrete and quantifiable." *Rifken v. CapitalSource Finance, LLC (In re Felt Mfg. Co., Inc.*), 402 B.R. 502, 523 (Bankr. D.N.H. 2009). It has been noted that "this is not an easy standard to meet." *Id.* (citing *Debbie Reynolds Hotel & Casino, Inc. v. Calstar Corp. (In re Debbie Reynolds Hotel & Casino, Inc.),* 255 F.3d 1061, 1067–68 (9th Cir.2001)). "A debtor does not satisfy her burden of

---

[17]  *Henhouse* overruled *Parque Forestal* to the limited extent, not relevant here, that *Parque Forestal* held that "third parties who equitably come to stand in the trustee's shoes" have standing to bring a claim under § 506(c). *Parque Forestal*, 949 F.2d at 511.

16

proof by suggesting hypothetical benefits." *In re Compton Impressions, Ltd*., 217 F.3d 1256,

1261 (9th Cir. 2000) (quoting *In re Cascade Hydraulics & Utility Service, Inc.,* 815 F.2d 546, 548

9th Cir. 1987)). A general assertion that the secured creditor benefited from the continued

operation of the business, without more, is also insufficient. *Id.* The debtor must prove that the

expenditures were made "primarily" to benefit the secured creditor.[18] *Parque Forestal*, 949 F.2d

at 512 (citing *Brookfield Production Credit Ass'n v. Borron*, 738 F.2d 951, 952 (8th Cir. 1984)).

"Typical examples [of allowed surcharge costs] include appraisal fees, auctioneer fees, moving

expenses, maintenance and repair costs, and advertising costs." *In re Swann*, 149 B.R. 137, 143

(Bankr. D.S.D. 1993); s*ee also*, 4 Alan N. Resnick & Henry J. Sommer, COLLIER ON

BANKRUPTCY ¶ 506.05 [4], at 506-118 (16th ed. 2009) ("Necessary expenses include appraisal

fees, auctioneer fees, advertising costs, moving expenses, storage charges, payroll of employees

directly and solely involved with the disposition of the subject property, maintenance and repair

costs, and marketing costs."). "Similarly, if a secured creditor has a lien on all, or virtually all, of

a debtor's assets, the debtor is engaged in ongoing business operations, and the debtor's

continued operations preserve or enhance the value of the secured creditor's collateral, items that

may qualify as 'necessary' expenses chargeable against the collateral include the debtor's payroll

costs, insurance costs, workers' compensation expenses, and post-petition administrative taxes."

*Id.* Attorneys' fees, whether actually paid or simply incurred by the estate, have been recognized

for § 506(c) treatment. *Felt Mfg*., 402 B.R. at 523 (Bankr. D.N.H. 2009) (citing

─────────────────────────

[18]  The IRS's position that the expenditures must have been for its *exclusive* benefit is rejected as
being inconsistent with First Circuit precedent.

*In re K & L Lakeland, Inc.*, 128 F.3d 203, 212 (4th Cir. 1997) (Hamilton, J., dissenting)).

As the First Circuit observed in *Parque Forestal*, while § 506(c) does not require advance consent by the secured creditor, consent is still a relevant consideration. A secured creditor may not have consented to a specific expenditure but may be subject to surcharge if it can be shown that the creditor acknowledged the desirability of the expenditure. *Id.* at 512.

The post facto attempt by a debtor to recover administrative expenses out of a secured creditor's cash collateral in a chapter 11 case is rare because it is risky. Normative chapter 11 practice dictates a debtor's seeking the secured creditor's consent or a court order for a carveout to cover some or all the debtor's administrative expenses before the expenses are incurred. This case is anything but normative. Here, not only did Strategic Labor fail pre-emptively to seek the IRS's approval for a carve-out for administrative expenses, it went ahead and spent the IRS's cash collateral without authority, including paying its attorneys' fees out of the IRS's cash.

While I will not overlook or condone the conduct of the debtor and its counsel, I am not prepared to deny outright the debtor's motions for § 506(c) recovery. After all, the sale to Infor which Strategic Labor and its professionals oversaw and consummated will result in a recovery by the IRS that is exponentially greater than what the IRS could have hoped to achieve through a forced liquidation of its collateral.[19]

---

[19]  The debtor's assets, consisting almost entirely of accounts receivable, work in process and intellectual property, were of the type whose value would plummet if ongoing operations had ceased and the assets were sold at a liquidation sale. Wolfson Affidavit at ¶ 5.

18

It remains Strategic Labor's burden to establish that the expenses for which it seeks § 506(c) status were reasonable and necessary and were expended primarily to benefit the IRS. Strategic Labor seeks to recover $100,661.35 in attorneys' fees and costs and $55,783.51 (although as noted earlier, Strategic Labor actually paid the Gondeks $58,165.25 during the post-petition period) in compensation and benefits paid to its insider management team. These expenditures significantly exceed the parameters for reasonable and necessary expenditures primarily benefitting the IRS.

Despite the debtor and its counsel's dismaying confusion about whether the IRS was a secured or a priority unsecured creditor, the record of this case has been consistent and unambiguous from the outset that the primary beneficiary of the debtor's efforts to sell its assets on a going concern basis in chapter 11 would be the IRS. While the IRS certainly did not consent to the surcharging of the sale proceeds or other proceeds of its collateral for Strategic Labor's costs, it acknowledged the desirability of the process by which the proceeds were generated by refraining from objecting to the sale. *Parque Forestal*, 949 F.2d at 512.

In these circumstances, the appropriate Strategic Labor costs eligible for § 506(c) treatment are the costs directly associated with the sale to Infor. Since it is clear that the continued operation of the debtor's business was a prerequisite to the sale, the debtor may recover its expenditures for compensation and benefits to its management team through the sale date of September 3, 2010. Daniel, Michael and Richard Gondek all terminated their employment with Strategic Labor in August 2010 and, subject to the offset discussed below, their compensation and benefits totaling $26,242.95 are allowable § 506(c) costs. James Gondek remained an employee of Strategic Labor

19

through December 31, 2010, at a weekly net salary of $1213.44, receiving total compensation

through that date of $29,122.68 and expense reimbursement of $372.88. Since the sale to Infor

closed on September 3, 2010, the allowable portion of James's compensation for § 506(c)

purposes is $12,134.40.

      Strategic Labor submits that James remained on the payroll post-closing to perform

various continuing obligations of the company to Infor. These continuing obligations were few

and certainly did not require a full-time employee. The prime post-closing obligation imposed by

the APA was the assignment to Infor of any executory contracts of Strategic Labor designated by

Infor within three months of the closing. APA at 10.6.[20] The only executory contract actually

assumed by the debtor and assigned to Infor post-closing was the contract with the Florida

Department of Corrections. The debtor has failed to supply any evidence, however, as to what if

any role James played in this process hence the debtor has failed to carry its burden of establishing

what portion of James' post-closing compensation should be allocated to this limited activity. The

debtor has failed also to allocate James's $372.88 in expense reimbursements between pre- and

post-closing periods. Accordingly, only $12,134.40 of James' compensation is allowable for

surcharge. This results in a grand total of Strategic Labor's operating costs eligible for recovery

---

[20]  The APA also required Strategic Labor to promptly forward any orders or inquiries for
Strategic Labor's goods or services to Infor for six months post-closing, APA at ¶ 10.3; to
cooperate with Infor in connection with any audit or response relating to the assets acquired by
Infor, APA at ¶ 10.4; and to offer support to Strategic Labor's existing customers who entered into
support and license agreements with Infor for the period from the closing to the end of the existing
customers' agreement with Strategic Labor. APA at ¶ 10.6. Again there is no evidence that James
expended any time attending to any of these matters.

from the IRS's collateral under Bankruptcy Codes § 506(c) of $38,377.35 before any further offset.

The debtor also proposes to surcharge the IRS for $100,661.35 in fees and expenses of the Gordon firm. This includes all the expenses of the firm in both its interim and final fee application totaling $5,849.85, and $94,811.50 in fees, consisting of the entire $73,587.50 from the interim application and $21,224.00 of the $35,799.50 from the final application.

A detailed analysis of the Gordon firm's daily billing records contained in the debtor's § 506(c) motion establishes that $38,871 in fees were billed by the firm for legal services directly related to the sale to Infor.[21]  In addition, a total of $2,500.00 was billed in connection with the motion to assume and assign the Florida Department of Corrections executory contract to Infor post-closing.[22]  The balance of the Gordon firm's billings for general administrative services, preparing fee applications and motions to employ professionals, obtaining approval of the DIP loan, legal services post-closing and the like are not appropriate for recovery out of the IRS's collateral. Of the $5,849.85 in expenses charged by the Gordon firm to Strategic Labor, almost half appears to have no relation whatsoever to the sale process or the Florida Department of Corrections matter. I find that $3,340.15 in expenses may be surcharged against the IRS's

---

[21]  The figure does not reflect any deduction for work that arguably might be duplicative and includes a generous estimate of time spent on the sale in instances where it was necessary to prorate so-called "lumped" time entries.

[22]  The figure is not exact as some of the time entries lumped time spent working on the Florida Department of Corrections matters with other matters for which no surcharge is being allowed.

21

collateral.[23] Thus the total in fees and expense reimbursements to the Gordon firm eligible for

§ 506(c) surcharge by Strategic Labor is $44,711.15 before any additional offset. Adding this to

the $38,377.35 in allowable management costs results in a grand total § 506(c) surcharge before

any offset of $83,088.50.

In the typical case, here the matter would rest. Unfortunately, in this case Strategic Labor,

without authority to do so, has already spent most of the money it seeks in its surcharge motions

and a good deal more besides. Before Strategic Labor is entitled to any recovery for benefits

conferred upon the IRS there must be taken into account as an offset any harm suffered by the IRS

as a result of Strategic Labor's and its counsel's conduct. To surcharge a secured creditor's

collateral for a benefit received without adjusting for offsetting detriment would be inequitable.

The IRS seeks disgorgement from Strategic Labor of the amount it paid to Balboa Capital

($18,957.41) on the grounds that the Gondeks caused the payments to be made so as to reduce their

exposure as guarantors. While this may be a reasonable inference, another factor of significance

is that, as set forth in the debtor's schedules, § 341 meeting testimony and motion to dismiss,

Balboa Capital's security interest was limited to a single item, workforce development

software.[24] Strategic Labor's United States trustee monthly operating reports indicate that

---

[23]  Included is $344.65 which is half of the expense described as "Copying and postage of
Nonevidentiary Hearing re [62]." That total expense appears to relate to two motions, one of
which was the motion to assume the Florida Department of Corrections contract.

[24]The Gondek Affidavit, which describes Balboa as holding an all-asset lien, predates all these
representations that Balboa held a single-asset lien. I assume therefore that the latter

Balboa was repaid $18,957.41 in approximately equal installments over a six month period

post-petition out of the company's general operating cash. Even assuming that Balboa's secured

claim was senior to the IRS lien (something the IRS disputes), Balboa's cash collateral would at

best consist of the proceeds of the sale of workforce development software. Strategic Labor's

general operating debtor in possession account as tracked in its United States trustee monthly

operating reports does not identify proceeds generated by the workforce development software

nor does the APA allocate the purchase price to individual assets. Thus Balboa's secured claim

may have been repaid, not with its cash collateral, but with the IRS's cash collateral. Since

Strategic Labor's use of the IRS's cash collateral was unauthorized and it has failed to establish

that Balboa was paid with the proceeds attributable only to Balboa's collateral, the payment to

Balboa was of direct and quantifiable detriment to the IRS. Strategic Labor's § 506(c) recovery

must, therefore, be reduced by the Balboa payments totaling $18,957.41, resulting in a net §

506(c) award of $64,131.09.

Even if the specifics of the Balboa payoff were ignored, I would have no difficulty

reducing the debtor's § 506(c) award by $18,957.41 as a sanction to the debtor, its management

and counsel for their collective failure to abide by the statutory requirements for use of cash

collateral, for their sloppy administration of this case, and most especially for their misleading

representation in paragraph 16 of the DIP Motion, all inuring to the ultimate detriment of the

IRS.

---

representations, which unlike the IRS's lien status have never been contradicted, reflect a
correction of the Gondek Affidavit.

23

I do not view the § 506(c) awards allowed here or the factors applied to arrive at them as being discretionary. The awards result from a straightforward application of relevant Bankruptcy Code provisions as informed by binding First Circuit precedent.

### Conclusion

As previously indicated, much more than the net § 506(c) award has already been taken by Strategic Labor and spent. Strategic Labor must, therefore, recover the unauthorized payments and thus I will issue disgorgement orders as follows. Strategic Labor paid $58,165.25 in management costs but $38,377.51 is the most that Strategic Labor may receive under § 506(c). Therefore, Strategic Labor must recover $19,787.74 from its payee, James Gondek, who will be ordered to disgorge this amount. Strategic Labor also paid without authority $78,738.05 in legal fees and expenses and based on a § 506(c) allowance of $44,711.15, must recover $34,026.90 from the Gordon firm who will be ordered to disgorge this amount.   However, I have reduced the §506(c) award by $18,957.41. Because I find the debtor's management and counsel equally responsible for the conduct described herein, especially the unauthorized use of cash collateral, I will apportion the reduction equally reducing the § 506(c) award for management costs and legal fees by $9,478.70 each. The debtor must recover an additional $9,478.70 from the four Gondeks who will be ordered, jointly and severally, to disgorge this amount and $9,478.70 from the Gordon firm who will be ordered to disgorge this amount. The debtor shall pay all amounts recovered to the IRS. The Gordon firm shall also pay to the IRS forthwith the $221,261.95 in net sale proceeds it is holding in its IOLTA account.

On June 15, 2011, the United States trustee filed a motion to convert this case to chapter 7.   After the filing of responsive pleadings and a hearing on August 11, 2011, that motion was continued pending rulings on the debtor's motion to dismiss and the motions of the IRS and the debtor which are the subject of this memorandum.    Having now adjudicated all these motions and in light of the results, it is appropriate to rule on the motion to convert by allowing it.

Separate orders shall issue.


Dated: March 5, 2012                                        By the Court,




                                                            _____
                                                            Melvin S. Hoffman
                                                            U.S. Bankruptcy Judge

Counsel Appearing:    The Gordon Law Firm
                      Boston, MA
                      For the Debtor

                      Rebecca Israel, United States Department of Justice
                      Washington, D.C.
                      For the Internal Revenue Service